# United States Court of Appeals for the Federal Circuit

2008-1040, -1054

MITTAL STEEL POINT LISAS LIMITED
(formerly known as Caribbean Ispat Limited),

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

GERDAU AMERISTEEL CORP.
and KEYSTONE CONSOLIDATED INDUSTRIES, INC.,

Defendants-Cross Appellants.

Michael A. Pass, Steptoe & Johnson LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Mark A. Moran and Eric C. Emerson.

L. Misha Preheim, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Gregory G. Katsas, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Jonathan Zielinski, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

Mary T. Staley, Kelley Drye & Warren LLP, of Washington, DC, argued for defendants-cross appellants. With her on the brief were Paul C. Rosenthal and Daniel P. Lessard.

Appealed from: United States Court of International Trade

Judge Donald C. Pogue

# United States Court of Appeals for the Federal Circuit

2008-1040, -1054

MITTAL STEEL POINT LISAS LIMITED
(formerly known as Caribbean Ispat Limited),

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

GERDAU AMERISTEEL CORP.
and KEYSTONE CONSOLIDATED INDUSTRIES, INC.,

Defendants-Cross Appellants.

Appeals from the United States Court of International Trade
in Case No. 05-00681, Judge Donald C. Pogue.

_____

DECIDED:  December 3, 2008

_____

Before NEWMAN and LOURIE, Circuit Judges, and ALSUP, District Judge.[*]

LOURIE, Circuit Judge.

_____

[*]    Honorable William Alsup, District Judge, United States District Court for the Northern District of California, sitting by designation.

DECISION

Mittal Steel Point Lisas Limited (formerly known as Caribbean Ispat Limited and now known as Arcelormittal Point Lisas Limited) ("Mittal") appeals from the judgment of the United States Court of International Trade affirming the Department of Commerce's ("Commerce's") classification of Mittal's composite rod as non-prime merchandise. Mittal Steel Point Lisas Ltd. v. United States, 491 F. Supp. 2d 1222 (Ct. Int'l Trade 2007). Gerdau Ameristeel Corp. and Keystone Consolidated Industries, Inc. (collectively "Gerdau") cross-appeal from the court's affirmance of Commerce's remand determination calculating credit expenses from the date of invoice, rather than the date of shipment. Mittal Steel Point Lisas Ltd. v. United States, 502 F. Supp. 2d 1345 (Ct. Int'l Trade 2007). Because the court correctly classified the goods and because Gerdau abandoned the argument for calculating credit expenses from the shipment date by failing to exhaust its administrative remedies on remand, we affirm on both issues.

BACKGROUND

Mittal manufactures and sells steel wire rod in Trinidad & Tobago. Together with its North American affiliate and importer, Mittal also sells steel wire rod for export to the United States. Under 19 U.S.C. § 1673 (2006), Commerce imposes an antidumping duty if it determines that (1) a category of foreign merchandise is being sold in the United States at less than fair market value and (2) the importation causes or threatens material injury to a U.S. market.[1] Commerce calculates that duty by comparing the

---

[1] In Mittal Steel Point Lisas Ltd. v. United States, No. 2007-1552, 2008 U.S. App. LEXIS 19774 (Fed. Cir. Sept. 18, 2008), we addressed the material injury prong of 19 U.S.C. § 1673 with respect to Mittal's steel wire rod. We vacated the judgment of the Court of International Trade and remanded the case to that court with instructions to remand the case to the International Trade Commission. If there is ultimately no

"normal value" to the "constructed export price." See id. Commerce determines the normal value by including foreign sales of "prime" merchandise but excluding foreign sales of "non-prime" merchandise. In determining the constructed export price, Commerce deducts credit expenses over a length of time, known as the credit expense period.

Mittal manufactures two types of steel wire rod that are relevant to this appeal— "prime" rod[2] and composite rod. Prime rod and composite rod are composed of steel of the same grade and chemical structure.[3] Commerce classifies steel wire rod based on eight characteristics: grade range, carbon content range, surface quality, deoxidization, maximum total residual content, heat treatment, diameter range, and coating. Commerce then assigns an eight-digit control number based on those characteristics. Mittal's composite and prime rod have the same control number and are thus the same in each of the eight characteristics. A coil of each contains approximately the same weight of steel.

However, prime and composite rod are listed separately on Mittal's price lists. The difference is that, while a coil of prime rod consists of a single piece of steel, a coil of composite rod contains multiple separate segments. Because of resulting processing inefficiencies, Mittal also sells composite rod at a lower price than prime rod.

material injury, no duty will be imposed, regardless of our decision today.

[2] Although we use the term "prime" in referring to Mittal's rod, we do not prejudge that Commerce correctly classified it as prime merchandise. Instead, we use "prime," as Mittal does, to distinguish over Mittal's composite rod.

[3] Although Gerdau asserts that the chemical structures are not the same, we need not deal with this issue in view of our holding in favor of Gerdau on other grounds.

Commerce thus found that composite rod was non-prime merchandise and excluded it from Commerce's normal value calculation because composite rod was "not identified as prime on [Mittal's] price list for matching purposes" and because, in Mittal's prime rod, Commerce "found identical or similar matches" to the rod sold in the United States. Carbon and Certain Alloy Steel Wire Rod from Trinidad & Tobago, 70 Fed. Reg. 69,512 & accompanying Issues and Decisions Mem., 9 cmt. 4, available at http://ia.ita.doc.gov/frn/summary/trinidad/E5-6331-1.pdf (Dep't of Commerce Nov. 16, 2005).

The Court of International Trade affirmed Commerce's non-prime determination because the composite rod was not identical to the prime rod. Mittal Steel, 491 F. Supp. 2d at 1229. The court reasoned that Mittal sold the rods at different prices, demonstrating that the rods had commercially significant differences. Id.

Commerce also computed Mittal's credit expense period to determine the duty Mittal owed. Credit expenses are the costs associated with money being owed to the seller after the seller has sold its merchandise but before the customer has paid the seller. Id. at 1230. Mittal follows a unique sales model in the United States. Under Mittal's system, a U.S. customer first places an order with Mittal's North American affiliate. Mittal then ships the rods from Trinidad to the United States. After the rods arrive in the United States, the North American affiliate issues an invoice to the customer and ships the rods to him. At any point prior to the date of invoice, all terms of sale, including the quantity of merchandise to be sold, are changeable.

In previous cases and in its prior administrative review involving Mittal, Commerce had calculated credit expenses beginning on the date of shipment. Thus, in

this case, Commerce initially began Mittal's credit expense period on the shipment date—the date Mittal shipped the merchandise from Trinidad to the United States.

However, in the same administrative review, Commerce had also determined a "date of sale." Commerce normally chooses the invoice date as the date of sale because, on the invoice date, the terms of sale have usually been fixed. Commerce uses the shipment date as the date of sale, however, when the shipment date is earlier than the invoice date or when a U.S. affiliate warehouses the merchandise in the United States and sells from inventory. In those situations, the terms of sale have not been fixed until the date that the seller ships the merchandise. In the same administrative review here, Commerce had used the invoice date, rather than the shipment date, as the date of sale for all of Mittal's constructed export price sales.

While the case was on appeal to the Court of International Trade, the court requested briefing on the date for beginning the credit expense calculation. Gerdau supported Commerce's determination, arguing that the date of sale was irrelevant to the credit expense period determination. The government responded by requesting a voluntary remand, with the consent of Mittal and Gerdau, for Commerce to reevaluate the credit expense period based on the date of sale. In other words, Commerce wanted to consider making the beginning of the credit expense period, which had been the shipment date, match the chosen date of sale, which had been the invoice date. On April 24, 2007, the court granted the voluntary remand for Commerce to "determine the date on which credit expenses should begin to run." Mittal Steel, 491 F. Supp. 2d at 1233. The court reasoned that, given Mittal's sales model and Commerce's decision

that the date of sale was Mittal's invoice date, Commerce could reasonably find that Mittal's terms of sale were not set until the invoice date.  Id. at 1232.

On remand, Commerce issued a draft remand determination on May 21, 2007, and requested comment from the parties by May 29, 2007.  In the draft remand determination, Commerce recalculated the credit expense period to begin on the invoice date because "the material terms of sale were not set before the invoice date."  On June 21, 2007, after receiving no comments from Gerdau, Commerce filed the final remand determination in the Court of International Trade, incorporating the other parties' comments and calculating credit expenses from the invoice date.  The court then affirmed Commerce's final remand determination, noting that Gerdau had "filed no comments on the remand results."  Mittal Steel, 502 F. Supp. 2d at 1347 n.1.

Mittal timely appealed to this court, and Gerdau has filed a timely cross-appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

"We review the Court of International Trade's judgment, affirming or reversing the final results of an administrative review, de novo."  Fag Kugelfischer Georg Schafer AG v. United States, 332 F.3d 1370, 1372 (Fed. Cir. 2003).  In so doing, "[w]e apply anew the same standard used by the court, and will uphold Commerce's determination unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law."  Yancheng Baolong Biochem. Prods. Co. v. United States, 337 F.3d 1332, 1333 (Fed. Cir. 2003) (citation and internal quotation marks omitted).  Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Suramerica de

Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Consol. Edison Co. v. Nat'l Labor Relations Bd., 305 U.S. 197, 229 (1938)). "[T]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." Id.

A.      Classification of Mittal's Composite Rod as Non-Prime

Mittal argues that Commerce incorrectly determined that Mittal's composite rods were non-prime merchandise. Mittal asserts that its prime and composite rods are identical for calculation purposes because, on each of Commerce's eight criteria, Mittal's prime and composite rods are identical, and they have the same control number. Moreover, according to Mittal, its composite rods are neither defective nor sold outside the ordinary course of trade, as they are used in the same applications as prime rod. Mittal asserts that a price difference between prime and composite rod alone is not a sufficient basis for Commerce's non-prime determination. Finally, Mittal argues that the Court of International Trade improperly substituted its own analysis for the agency's insufficient analysis in order to uphold Commerce's decision.

Gerdau and the government respond that significant differences exist between Mittal's composite and prime rods. According to Gerdau, Mittal's composite rod consists of smaller pieces than the industry standard, is always sold for less than prime rod, and is not identified as "prime" quality in price lists. The government adds that the control number and the eight criteria are irrelevant to Commerce's prime determination. Gerdau adds that Mittal's composite rod sales are outside the ordinary course of trade because, compared with Mittal's prime rods, the composite rods are used differently,

they are a small percentage of Mittal's total sales, they are priced lower, and they could be classified as overruns or seconds.

We agree with Gerdau and the government that Commerce correctly classified Mittal's composite rods as non-prime merchandise. The court must defer to Commerce's permissible construction of the statute and permissible choice of matching methodology. See Koyo Seiko Co. v. United States, 66 F.3d 1204, 1210-11 (Fed. Cir. 1995) (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984)). "Under Chevron, in order to survive judicial scrutiny, an agency's construction need not be the only reasonable interpretation or the reading the court would have reached if the question initially had arisen in a judicial proceeding." Id. at 1210.

In determining the normal value of merchandise, Commerce may classify some goods as non-prime, taking them out of the normal value calculation. See id. at 1206 (explaining that Commerce must "match" the U.S. product to a similar home-market product); see also 19 U.S.C. § 1677(16)(A) (2006) (describing that goods that are "identical in physical characteristics [and] produced in the same country by the same person" may be matched). Although Commerce has established eight characteristics for reviewing steel wire rod, resulting in a control number, this categorization is distinct from and not conclusive of the prime and non-prime determination. For example, Commerce may conclude that merchandise is non-prime when it has material defects or is sold outside the ordinary course of trade. See SKF USA, Inc. v. United States, 537 F.3d 1373, 1380 (Fed. Cir. 2008) (sold outside the ordinary course of trade); Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea, 70 Fed. Reg. 12,443, 12,445 cmt. 6 & accompanying Issues and Decisions Mem., 20-24 cmt. 6,

available at http://ia.ita.doc.gov/frn/summary/korea-south/E5-1065-1.pdf (Dep't of Commerce Mar. 14, 2005) (material defects). Commerce may also conclude that merchandise is non-prime if it has commercially significant differences from prime merchandise. Cf. Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1384 (Fed. Cir. 2001) ("Commerce has concluded that merchandise should be considered to be identical despite the existence of minor differences in physical characteristics, if those minor differences are not commercially significant. We conclude that this standard adopted by Commerce constitutes a permissible construction of the statute."); Certain Polyethylene Terephthalate Film, Sheet, and Strip from India, 70 Fed. Reg. 8,072 & accompanying Issues and Decisions Mem., 22 cmt. 5, available at http://ia.ita.doc.gov/frn/ summary/india/E5-658-1.pdf (Dep't of Commerce Feb. 17, 2005) (finding shorter rolls to be prime solely because there was "no evidence . . . that Jindal America consistently sold shorter rolls of PET film at prices lower than that charged for full rolls of identical PET film"). Indeed, Commerce may rely on any reasonable distinction. See Koyo Seiko, 66 F.3d at 1210-11.

In this case, as Commerce explained, composite rod was "not identified as prime on [Mittal's] price list for matching purposes." Carbon and Certain Alloy Steel Wire Rod from Trinidad & Tobago, 70 Fed. Reg. 69,512 & accompanying Issues and Decisions Mem., 9 cmt. 4. Mittal admits that it charges a lower price for composite rod and that composite rod is less efficient to use. Those price and quality differences represent "commercially significant" differences. And Commerce explained that Mittal's prime rod better represented an "identical or similar match[]" with the rod sold in the United States.

<u>Id.</u> We therefore hold that Commerce's decision to treat composite rod as non-prime merchandise was supported by substantial evidence and was adequately explained.

B.    <u>Calculation of Credit Expenses from Invoice Date</u>

In its cross-appeal, Gerdau argues that, on remand, Commerce should have calculated Mittal's credit expenses beginning on the shipment date, not the invoice date. Gerdau points out that, in its previous cases and in the prior administrative review involving Mittal, Commerce has calculated credit expenses beginning on the date of shipment. According to Gerdau, Commerce has merely given a post hoc rationalization for changing its practice. Gerdau also argues that Commerce has specifically rejected the claim that the date of sale is relevant in determining the credit expense period. According to Gerdau, Mittal's process is not unique and does not warrant different treatment from previous practice because, like most sellers, once Mittal has shipped goods to one customer, it can no longer sell those goods to another customer.

The government and Mittal respond first by arguing that Gerdau both waived its argument before the Court of International Trade and failed to present its argument to Commerce on remand, thus failing to exhaust its administrative remedies. The government and Mittal argue that no exception to the exhaustion requirement applies here because Gerdau's arguments involve the factual question of when Mittal can no longer sell the goods and because Gerdau's participation in the remand proceeding would not have been futile, as Commerce had indicated that it would reevaluate its position.

On the merits, the government and Mittal respond that Commerce calculates the date of sale similarly to the way it calculates credit expenses, so the date of sale is

relevant to the credit expense calculation. Moreover, according to the government and Mittal, Commerce's policy bulletin states that the credit expense on a sale is measured by the interest on the "sale revenue," requiring the date of sale to have passed by the beginning of the credit expense period. The government and Mittal also argue that Commerce's practice of using the shipping date for credit expenses is premised on a seller having committed specific goods to a specific customer. Unlike other sellers, Mittal remains in control of the terms of sale and the goods, not committing them to a particular customer, until the invoice date. According to Mittal and the government, Mittal's sales process is similar to warehousing or unloading goods in the United States, for which Commerce calculates the shipping date from the date when the goods leave the warehouse (similar to Mittal's invoice date), not when the company ships them from abroad.

On the waiver and exhaustion arguments, Gerdau responds that it raised the credit expense issue before Commerce and before the court. Gerdau argues that it exhausted its administrative remedies because Commerce knew Gerdau's position, and raising the issue again would have been futile, as evidenced by Commerce's choice to reject Gerdau's position. Moreover, according to Gerdau, the date for calculating credit expenses is a purely legal issue—there was no factual dispute over the date that the goods were shipped from the port.

We agree with the government and Mittal that, on the issue of the credit expense period, Gerdau abandoned its argument by failing to exhaust its administrative remedies. Gerdau should have argued to Commerce on remand, during the comment period, in favor of beginning the credit expense period on the shipment date. At the

very least, Gerdau should have indicated that it maintained its prior position with respect to the credit expense period. Moreover, even if Gerdau had preserved the issue for appeal, Commerce's determination to begin the credit expense period on the invoice date was supported by substantial evidence and was not contrary to law.

In the initial hearing before Commerce, Gerdau argued that the credit expense period should begin on the shipment date. When the Court of International Trade requested briefing on the credit expense period, Gerdau again argued that the credit expense period should begin on the shipment date. However, with the consent of Mittal and Gerdau, the government then requested a voluntary remand to recalculate the credit expense period based on the invoice date, and Gerdau did not object to the remand. On remand to Commerce, Gerdau again did not raise its shipment date argument. Gerdau effectively chose not to participate in the remand proceedings. It did not comment on Commerce's proposed revised results and submitted no argument as to why Commerce should continue to adhere to its initial determination.

Gerdau was procedurally required to raise the issue before Commerce at the time Commerce was addressing the issue. "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952) (emphasis added); see also Metz v. United States, 466 F.3d 991, 999 (Fed. Cir. 2006). "[N]o one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Sandvik Steel Co. v. United

States, 164 F.3d 596, 599 (Fed. Cir. 1998) (citations and quotation marks omitted). Gerdau failed to raise the issue at the appropriate time on remand and thus abandoned its argument by failing to exhaust its administrative remedies before Commerce. See AIMCOR v. United States, 141 F.3d 1098, 1111-12 (Fed. Cir. 1998) (holding that, when Aimcor failed to raise an issue on remand to Commerce "during the applicable comment period," it "was precluded from raising this issue de novo before the court").

Gerdau argues that two exceptions to the exhaustion requirement apply: (1) its shipment date argument is a purely legal argument, and (2) raising the argument before Commerce would have been futile. See Corus Staal BV v. United States, 502 F.3d 1370, 1378-79 & n.4 (Fed. Cir. 2007). Neither exception applies here. Gerdau's argument is not purely legal—Gerdau relies on a judicial record of Commerce's past practices, an assessment of Commerce's justifications of those practices, and an analysis of why the unique facts of Mittal's shipping practice do not support a deviation from Commerce's practice. See Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003) (finding no pure question of law when a party alleged that Commerce changed its well-established practice).

Additionally, raising the argument before Commerce would not have been futile. To show futility, a party must demonstrate that it "would be required to go through obviously useless motions in order to preserve [its] rights." Corus Staal, 502 F.3d at 1379 (citations and quotation marks omitted). Moreover, we apply the exception narrowly. Id. Gerdau argues that Commerce understood Gerdau's position based on Gerdau's arguments in the initial administrative proceeding and its submissions to the court, and that making them again would have been obviously useless. But Commerce

had requested the remand to reevaluate its credit expense calculation because of a possible conflict with its other practices. That request indicates that Commerce might have been receptive to counter-arguments. Commerce also explicitly requested comments from the parties on its draft remand determination, and Gerdau did not comment. Given that Gerdau never disputed the remand, Commerce could have reasonably assumed that Gerdau, much like Commerce itself, was persuaded by Mittal's arguments and no longer opposed revision of the credit expense calculations. The futility exception thus does not apply. We therefore hold that Gerdau failed to exhaust its administrative remedies.

Even if Gerdau had preserved the issue for appeal, we would affirm Commerce's determination to begin the credit expense period on the invoice date as supported by substantial evidence and not contrary to law. The issue in Gerdau's cross-appeal is when Mittal actually began to incur credit expenses. "Credit expenses are the costs associated with carrying accounts receivable on the books and the expenses related to extending credit to purchasers for the interim between shipment and payment." AIMCOR, 141 F.3d at 1111 n.21. Even though, as Gerdau points out, Commerce's standard practice is to begin calculating credit upon the date of shipment, Commerce explained in its remand determination that Mittal has an exceptional case that provides a reason to deviate from Commerce's normal practice. For most companies, irrespective of the date of sale, once goods have been shipped from a foreign port, the material terms of sale have been set, as the seller may not then sell those goods to another customer. See Silicomanganese from India, 67 Fed. Reg. 15,531 & accompanying Issues and Decisions Mem., cmt. 19, available at

http://ia.ita.doc.gov/frn/summary/india/02-7952-1.txt (Dep't of Commerce Apr. 2, 2002) (beginning the credit period on the date of shipment because "at this point, the company has identified a specific customer and, therefore, the goods are no longer available for general sale").  Thus, at that point, the seller has extended credit to a specific buyer.  In Mittal's case, however, record evidence shows that the material terms of sale were not set before the invoice date, and Mittal therefore retained control of the goods until the invoice date.  Thus, no credit was extended to Mittal until the invoice date.  Commerce's judgment calculating credit expenses beginning on the invoice date was therefore supported by substantial evidence and was not contrary to law.

## CONCLUSION

Accordingly, the judgment of the United States Court of International Trade is affirmed.

## AFFIRMED