# United States Court of Appeals for the Federal Circuit

---

**DONGTAI PEAK HONEY INDUSTRY CO., LTD.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES OF AMERICA,**
**AMERICAN HONEY PRODUCERS ASSOCIATION,**
AND **SIOUX HONEY ASSOCIATION,**
*Defendants-Appellees.*

---

2014-1479

---

Appeal from the United States Court of International Trade in No. 1:12-cv-00411-NT, Senior Judge Nicholas Tsoucalas.

---

Decided: January 30, 2015

---

YINGCHAO XIAO, Lee & Xiao, of San Marino, California, for plaintiff-appellant. With her on the brief was DOUGLAS CAMPAU.

JANE C. DEMPSEY, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for defendant-appellee United States. With her on the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and REGINALD T. BLADES, JR., Assistant Director.

MICHAEL J. COURSEY, Kelley Drye & Warren LLP, of Washington, DC, for defendants-appellees American Honey Producers Association and the Sioux Honey Association. With him on the brief were R. ALAN LUBERDA and BENJAMIN BLASE CARYL.

————————————

Before WALLACH, TARANTO, and CHEN, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Appellant Dongtai Peak Honey Industry Co., Ltd. ("Dongtai Peak") appeals the decision of the United States Court of International Trade ("CIT") denying its Motion for Judgment on the Agency Record. *See Dongtai Peak Honey Indus. Co. v. United States*, 971 F. Supp. 2d 1234 (Ct. Int'l Trade 2014). Because the United States Department of Commerce ("Commerce") properly exercised its discretion in denying Dongtai Peak's untimely filings, and because Commerce's decisions to treat Dongtai Peak as part of the China-wide entity and to impose a dumping margin based on adverse facts available were supported by substantial evidence and were in accordance with law, this court affirms.

BACKGROUND

I. Facts

In 2001, Commerce imposed an antidumping duty order on honey imported from the People's Republic of China ("China"). *Honey From the People's Republic of China*, 66 Fed. Reg. 63,670 (Dep't of Commerce Dec. 10, 2001) (notice of amended final determination of sales at less than fair value and antidumping duty order) (the "Order"). In January 2012, Commerce initiated the tenth administrative review of the Order for the period of review December 1, 2010, through November 30, 2011. *Initiation of Antidumping & Countervailing Duty Administrative Reviews & Requests for Revocation in Part,* 77

Fed. Reg. 4759 (Dep't of Commerce Jan. 31, 2012) ("*Initiation*"). Dongtai Peak was named a respondent in this review. *Id.* at 4761.

As part of the review, on March 2, 2012, Commerce issued a non-market economy questionnaire (the "Questionnaire") to Dongtai Peak, which included Section A (General Information), with a deadline of March 23, 2012, and Sections C (Sales to the United States) and D (Factors of Production), with a deadline of April 8, 2012. Appellant timely filed a response to Section A of the Questionnaire, and filed its responses to Sections C and D after receiving a one-day extension of the deadline from Commerce. Because Appellant's extension request was received less than six minutes before the submission deadline for Sections C and D, in granting the request Commerce stated: "To ensure that [Commerce] is fully able to consider requests of this nature, we advise Dongtai Peak to plan accordingly and file any future extension requests as soon as it suspects additional time may be necessary." J.A. 157.

On April 3, 2012, Commerce issued a Supplemental Section A Questionnaire (the "Supplemental Questionnaire") to address certain deficiencies in Dongtai Peak's original Section A response. The deadline to respond to the Supplemental Questionnaire was "COB [Close of Business], April 17, 2012." J.A. 158. However, Dongtai Peak failed to submit its response by this deadline. Instead, on April 19, 2012, Dongtai Peak filed an untimely request (the "April 19 Letter") to extend the deadline to April 27, 2012, claiming good cause for an extension existed because of the overlap with the deadline to file its responses to Sections C and D, a national holiday, and various issues with its translator, its United States-based attorneys, and its computers. In response, the American Honey Producers Association and Sioux Honey Association ("Petitioners") submitted an objection to the untimely extension request. On April 24, 2012, Appellant submit-

ted a response to the objection, restating its claim that good cause existed for the extension. Then, on April 27, 2012, Dongtai Peak submitted a second request for an additional one-day extension of the deadline (the "April 27 Letter"). Following the close of business on April 27, 2012, Appellant submitted its response to the Supplemental Questionnaire (the "Supplemental Response") without Commerce having granted the extension requests in the April 19 or April 27 Letters.

On May 22, 2012, Commerce denied Dongtai Peak's extension requests because "good cause [did] not exist . . . to extend retroactively its deadline." J.A. 190. Commerce noted although Appellant explained why it could not timely file its Supplemental Response, it "provided no explanation as to why it was unable to file its extension request in a timely manner prior to the deadline for its questionnaire response." J.A. 190. It also noted Dongtai Peak had "previously been cautioned with respect to late extension requests when it requested an extension of the deadline to file its Section C and D questionnaire responses five minutes before the deadline for that questionnaire response." J.A. 189. Commerce therefore removed Appellant's extension requests and its Supplemental Response from the official record.

Dongtai Peak requested reconsideration of this determination, but Commerce upheld its decision to deny the extension requests and to remove the requests and the Supplemental Response from the record in its *Preliminary Results*. *Honey From the People's Republic of China*, 77 Fed. Reg. 46,699, 46,701–02 (Dep't of Commerce Aug. 6, 2012) ("*Preliminary Results*"). In doing so, Commerce again noted the April 19 Letter did not address Dongtai Peak's inability to file an extension request by the deadline, and stated the deadline was significant because Commerce had found Appellant's United States sales to be non-bona fide in prior reviews, and therefore needed time for a full analysis of the information sought

in the Supplemental Questionnaire. *Id.* Accordingly, in the *Preliminary Results*, Commerce determined that without the Supplemental Response, the record lacked sufficient information to calculate a separate rate for Dongtai Peak, and therefore the company would be considered part of the China-wide entity. *Id.* at 46,702. In addition, Commerce determined the China-wide entity did not cooperate to the best of its ability during the review, and therefore Commerce relied entirely on adverse facts available ("AFA") to determine the dumping margin for the China-wide entity. *Id.* Commerce selected a rate of $2.63 per kilogram based on the rate calculated for Anhui Native Produce Import & Export Corporation ("Anhui Native") during the sixth administrative review, which had also been assigned to the China-wide entity in the sixth and seventh administrative reviews. *Id.* at 46,703.

On November 26, 2012, the *Final Results* of the review were issued, upholding the *Preliminary Results* in their entirety. *Administrative Review of Honey From the People's Republic of China*, 77 Fed. Reg. 70,417 (Dep't of Commerce Nov. 26, 2012) (final results of antidumping duty administrative review) ("*Final Results*"), and accompanying Issues & Decision Memorandum (Nov. 19, 2012) (J.A. 137–56) ("*Issues & Dec. Mem.*").

## II. Proceedings

In December 2012, Dongtai Peak filed an action in the CIT challenging several aspects of the *Final Results*, including: (1) the denial of its extension requests and the removal of those requests and the Supplemental Response from the record; (2) Commerce's decision to consider Dongtai Peak part of the China-wide entity; (3) Commerce's use of AFA to calculate the dumping margin for the China-wide rate; and (4) the $2.63 per kilogram AFA rate itself. Dongtai Peak moved for Judgment on the Agency Record, which the CIT denied on March 21, 2014.

In response to Dongtai Peak's argument that Commerce improperly rejected its extension requests and removed the filings from the record, the CIT found Commerce's determinations were consistent with its regulations and within its discretion. In addition, the CIT found "Commerce reasonably determined that [Dongtai] Peak's extension requests were unsupported by good cause" because Commerce found (1) Appellant "failed to comply with the regulations by filing its extension requests after the deadline expired"; (2) "the facts of the instant case did not warrant granting [Dongtai] Peak's untimely requests"; and (3) Appellant "was aware of the deadline in question and its particular importance." *Dongtai Peak*, 971 F. Supp. 2d at 1240 (citing *Issues & Dec. Mem.* at 5–6). The CIT also found Commerce's denial of the extension requests did not violate Appellant's "statutory rights" because the company had notice of the deadline and an opportunity to comply, but simply failed to file a timely extension request. *Id.* at 1240–41.

As to Dongtai Peak's argument that Commerce improperly denied it separate rate status, the CIT found Commerce reasonably concluded that without the Supplemental Response, "[t]he record lacked certain information regarding [Dongtai] Peak's separate rate eligibility because [it] failed to timely file its extension requests and failed to show good cause to extend the deadline." *Id.* at 1242. As to Appellant's initial Section A response that remained on the record, the CIT found the company did not identify any evidence in that response demonstrating the lack of government control as required for separate rate status. *Id.* Although there were translations of Chinese law and information concerning Dongtai Peak's ownership and corporate structure in the initial Section A response, the CIT found this did not render Commerce's decisions unsupported by substantial evidence. *Id.* Thus, the CIT held Commerce reasonably included Dongtai Peak in the China-wide entity.

Regarding Dongtai Peak's challenge to Commerce's use of AFA in calculating the China-wide rate, the CIT found Commerce's determination was reasonable and consistent with law. *Id.* at 1244. In particular, the CIT observed "Commerce did not simply equate [Dongtai] Peak's untimely submission with a failure to cooperate," but "considered the circumstances of [Dongtai] Peak's untimely submission." *Id.* As to the actual rate calculated using AFA, the CIT noted Dongtai Peak provided no evidence of market fluctuations or other changes in the Chinese honey industry since the 2006–2007 review, and therefore its "bare assertion that such changes occurred is insufficient to undermine Commerce's selection of [Anhui Native's] rate to determine the margin for the [China]-wide entity." *Id.* at 1244. The CIT therefore concluded Commerce's selection of the rate was supported by substantial evidence.

Dongtai Peak filed a timely appeal and this court has jurisdiction under 28 U.S.C. § 1295(a)(5) (2012).

DISCUSSION

I. Standard of Review

This court reviews decisions of the CIT de novo, "apply[ing] anew the same standard used by the [CIT]." *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380 (Fed. Cir. 2008). Under that standard, this court must uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2006). "Although such review amounts to repeating the work of the [CIT], we have noted that 'this court will not ignore the informed opinion of the [CIT].'" *Diamond Sawblades Mfrs. Coal. v. United States*, 612 F.3d 1348, 1356 (Fed. Cir. 2010) (quoting *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 983 (Fed. Cir. 1994)); *see also Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007)

("When performing a substantial evidence review, . . . we give great weight to the informed opinion of the [CIT]. Indeed, it is nearly always the starting point of our analysis.") (internal quotation marks and citation omitted).

Substantial evidence is defined as "more than a mere scintilla," as well as evidence that a "reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). This court's review is limited to the record before Commerce in the particular review proceeding at issue and includes all evidence that supports and detracts from Commerce's conclusion. *Sango Int'l L.P. v. United States*, 567 F.3d 1356, 1362 (Fed. Cir. 2009). An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

## II. Legal Framework

The antidumping statute authorizes Commerce to impose duties on imported goods that are sold in the United States at less-than-fair value if it is determined that a domestic industry is "materially injured, or threatened with material injury." *See* 19 U.S.C. § 1673. Once an antidumping duty order covering certain goods is in place, "Commerce periodically reviews and reassesses antidumping duties" during administrative reviews. *Gallant Ocean (Thai.) Co. v. United States*, 602 F.3d 1319, 1321 (Fed. Cir. 2010) (citing 19 U.S.C. §§ 1673, 1675(a)).

In calculating antidumping margins, Commerce generally determines individual dumping margins (separate rates) for each known exporter or producer. 19 U.S.C. § 1677f-1(c)(1). If it is not practicable to calculate individual dumping margins for every exporter or producer, Commerce may examine a reasonable number of respondents (mandatory respondents), such as Dongtai Peak. *See*

*id.* § 1677f-1(c)(2).    In antidumping duty proceedings involving merchandise from a non-market economy,[1] however, Commerce presumes that all respondents are government-controlled and therefore subject to a single country-wide rate. *See Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997). Respondents may rebut this presumption and become eligible for a separate rate by establishing the absence of both de jure and de facto government control. *Id.* If a respondent fails to establish its independence, Commerce relies upon the presumption of government control and applies the country-wide rate to that respondent. *Transcom, Inc. v. United States*, 182 F.3d 876, 882 (Fed. Cir. 1999).

III. Commerce Properly Exercised Its Discretion in Rejecting Appellant's Extension Requests and Supplemental Response

On appeal, Dongtai Peak repeats the arguments it raised before the CIT. First, Appellant argues Commerce's rejection of and removal from the record of its extension requests and the Supplemental Response was improper and not in accordance with law because Dongtai Peak established good cause to extend the deadline. In

---

[1]    A "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A). "Because it deems China to be a nonmarket economy country, Commerce generally considers information on sales in China and financial information obtained from Chinese producers to be unreliable for determining, under 19 U.S.C. § 1677b(a), the normal value of the subject merchandise." *Shanghai Foreign Trade Enters. Co. v. United States*, 318 F. Supp. 2d 1339, 1341 (Ct. Int'l Trade 2004).

particular, Appellant claims good cause was shown in the April 19 Letter which described Dongtai Peak's

> 1) difficulties encountered in overseas communication between rurally-located Appellant and its US-based counsel; 2) difficulties encountered in communication between Appellant and its translator; 3) difficulties encountered as a consequence of a 4-day-long Chinese national holiday; 4) debilitating computer system malfunctions and related time-consuming repair efforts; and 5) the unexpected burden to Appellant['s] personnel of having to prepare responses to [the Supplemental Questionnaire] and its Section C and D questionnaires over an overlapping timeframe.

Appellant's Br. 15. In addition, in contrast to Dongtai Peak's purported showing of good cause, Appellant contends Commerce "articulated no basis for [its] conclusion, such as exactly how or why the explanation provided in the [April 19 Letter] does not constitute good cause," and therefore its determination is "not supported by substantial evidence, and it remains vague as to exactly what Commerce means by good cause." *Id.* 14–15.

Relying on other administrative proceedings, Dongtai Peak argues "Commerce has a long practice of keeping [extension] requests on the case record, and approving them, even when they are submitted subsequent to the applicable time limit," and "has articulated no legally valid reason for its departure from this practice in the underlying review proceeding." *Id.* at 10–11. In addition, Appellant asserts that while Commerce claimed it needed time to fully consider extension requests, "there were no pressing deadlines in the present case that would have made acceptance and granting of the extension request at all rushed or difficult." *Id.* at 6, 13. To Appellant, this case "involve[s] a small amount of information (*a mere supplemental questionnaire* dealing with a single sec-

tion)," and when Appellant submitted its Supplemental Response, "there were many months yet before Commerce's final results were due. That is, there was ample time for Commerce to complete a very thorough and comprehensive analysis." *Id.* at 24 (emphasis added). Finally, Dongtai Peak argues "fairness and accuracy also require that Commerce accept the late submission" because "Commerce's refusal to extend the deadline unfairly prejudiced Appellant's right to receive its own calculated rate using its own information." *Id.* at 6, 25–26.

Under 19 C.F.R. § 351.302(b) (2012),[2] Commerce "may, for good cause, extend any time limit established by this part." A party may request an extension "[b]*efore the applicable time limit . . . expires,*" and such a "request must be in writing, . . . and state the reasons for the request." *Id.* § 351.302(c) (emphasis added). If Commerce refuses to extend the time limit, it "will not consider or retain in the official record of the proceeding . . . [u]ntimely filed factual information, written argument, or other material that the Secretary rejects." *Id.* § 351.302(d)(1)(i).

The United States Supreme Court has clarified that, "[a]bsent constitutional constraints or extremely compelling circumstances[,] the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) (internal quotation marks and citation

---

[2]    In September 2013, Commerce amended 19 C.F.R. § 351.302, effective October 21, 2013. *Extension of Time Limits*, 78 Fed. Reg. 57,790 (Dep't of Commerce Sept. 20, 2013) (final rule). However, the language quoted herein reflects the regulations in effect during the underlying review.

omitted). "Accordingly, absent such constraints or circumstances, courts will defer to the judgment of an agency regarding the development of the agency record." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2012). In addition, "[i]n order for Commerce to fulfill its mandate to administer the antidumping duty law, including its obligation to calculate accurate dumping margins, it must be permitted to enforce the time frame provided in its regulations." *Yantai Timken Co. v. United States*, 521 F. Supp. 2d 1356, 1371 (Ct. Int'l Trade 2007).

Here, Commerce properly exercised its discretion in rejecting Dongtai Peak's extension requests and Supplemental Responses because (1) the extension requests were submitted after the established deadline in violation of 19 C.F.R. § 351.302(c), and (2) Appellant failed to show "good cause" for an extension as required by § 351.302(b). As to its good cause arguments, Commerce properly found Dongtai Peak's April 19 Letter describing its difficulties in completing the Supplemental Response did not demonstrate why the company was unable to file timely its extension request. Indeed, all of the causes of delay noted in the April 19 Letter were known to Appellant prior to the April 17th deadline, and did not prevent the company from filing an extension request before that date. *See Issues & Dec. Mem.* at 6 ("[N]one of these reasons explained why [Dongtai Peak] was unable to file the extension request before the existing April 17, 2012, deadline and none of these reasons constitute 'good cause' to grant a late-filed extension request, especially in the context of an administrative review it requested itself."). Indeed, the record shows the company was closed for the Chinese holiday from April 5 through 8; the computer difficulties occurred sometime between April 1 and 4; and the deadline for the Sections C and D responses was April 9. J.A. 510, 288–92.

Thus, Commerce reasonably determined Dongtai Peak was entirely capable of at least submitting an extension request on time, but simply failed to do so; therefore, good cause did not exist to retroactively extend the deadline. *Issues & Dec. Mem.* at 6; *see* 19 C.F.R. § 351.302(b), (c). Having properly denied the extension requests, Commerce also reasonably determined the Supplemental Response was untimely and removed it from the record pursuant to 19 C.F.R. § 351.302(d).

As to Dongtai Peak's claim that Commerce failed to identify why the April 19 Letter did not establish good cause, Appellant misunderstands its obligation to submit a written extension request before the time limit specified by Commerce and to "state the reasons for the request." *Id.* § 351.302(c). That is, Commerce was not required to demonstrate good cause for rejecting Dongtai Peak's untimely submissions. As the Government notes, "[i]t is not for Dongtai Peak to establish Commerce's deadlines or to dictate to Commerce whether and when Commerce actually needs the requested information." United States' Br. 23; *see PSC VSMPO*, 688 F.3d at 760–61 (It is fully within Commerce's discretion to "set and enforce deadlines" and this court "cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered.").

Appellant's argument regarding Commerce's "long practice" of approving untimely extension requests is equally unpersuasive. As noted, Commerce may grant extension requests if it determines the extension request provides good cause for extending the deadline. 19 C.F.R. § 351.302(b). In the various administrative reviews cited by Appellant, Commerce found good cause was shown and therefore exercised its discretion in granting the untimely extension requests. Here, by contrast, Commerce did not find good cause. In addition, Dongtai Peak's argument ignores the fact that Commerce also routinely *rejects*

untimely-filed submissions. In this case, moreover, Commerce explicitly cautioned Dongtai Peak on several occasions against making untimely extension requests. *See, e.g.*, J.A. 157 ("To ensure that [Commerce] is fully able to consider requests of this nature, we advise Dongtai Peak to plan accordingly and file any future extension requests as soon as it suspects additional time may be necessary.").

As to Dongtai Peak's presumption that Commerce had adequate time to process this review, Commerce should not be burdened by requiring acceptance of untimely filings closer to the final deadline for the administrative review. While Appellant claims this case involves "a mere supplemental questionnaire" that Commerce had "ample time" to review, Appellant's Br. 24, the Supplemental Questionnaire is actually comprised of nine pages of questions regarding Dongtai Peak's management, shareholders, accounting practices, affiliations, United States sales, domestic sales, and merchandise, and was due less than four months before the deadline for Commerce to issue the *Preliminary Results*, J.A. 158–77. Furthermore, as Commerce specifically noted, the deadlines in this case were important because in two prior reviews Commerce found Dongtai Peak's United States sales to be not bona fide, a determination that requires careful consideration of the totality of circumstances. *See Issues & Dec. Mem.* at 5. Thus, the Supplemental Questionnaire was intended to elicit information "regarding [Dongtai Peak's] reported quantity and value, its separate rate status, structure and affiliations, sales process, accounting and financial practices; and merchandising," information which "has proven vital to [Commerce's] prior non-bona fide analyses." *Id.* Commerce fully explained its need for a "significant amount of time and effort to gather the necessary information, consider the facts of the record, and provide interested parties with an appropriate period for comments and rebuttal comments." *Id.* at 13.

As to Dongtai Peak's fairness and accuracy argument, this court has made clear Commerce's rejection of untimely-filed factual information does not violate a respondent's due process rights when the respondent had notice of the deadline and an opportunity to reply. *See PSC VSMPO*, 688 F.3d at 761–62. Here, the record shows Dongtai Peak was afforded both notice and a meaningful opportunity to be heard. In particular, as Commerce noted, Appellant "was well aware of the established deadlines in this case"; Commerce "advised [Dongtai] Peak of the importance of submitting its documents in a timely manner"; and Dongtai Peak "was aware of the consequences of its not doing so." *Issues & Dec. Mem.* at 11 (citations omitted).

Accordingly, because Dongtai Peak failed to establish good cause with respect to its failure to submit its extension requests in a timely manner, Commerce reasonably exercised its discretion in rejecting the requests and in enforcing the applicable deadline.

## IV. Commerce's Decision to Deny Appellant Separate Rate Status Was Supported by Substantial Evidence and Was in Accordance with Law

Next, Dongtai Peak argues Commerce erred in denying it separate rate status because "[t]he record contained substantial and compelling evidence indicating that [Appellant] is eligible for a separate rate." Appellant's Br. 28. Specifically, Appellant claims the initial Section A Questionnaire "included no less than ten pages of questions, including extensive questions specifically addressing separate rate eligibility," and Dongtai Peak "provided extensive narrative responses to these questions, as well as all required supporting documentation." *Id.* at 29. In addition, Appellant claims, there was no record evidence that its export activities were subject to government control, so Commerce's conclusion that Appellant was not entitled to separate rate status was not based on substantial evidence. Dongtai Peak also argues the Supplemental

Questionnaire "did not directly address government control at all, but merely included a handful of questions—in what Commerce labeled as the 'Separate Rates' section of its supplemental questionnaire—having to do with prior work experience and responsibilities of Appellant's management and ownership." *Id.* at 30.

As noted, in antidumping proceedings involving merchandise from a non-market economy, Commerce presumes all respondents are government-controlled and therefore subject to the country-wide rate. *See Sigma*, 117 F.3d at 1405. Respondents may rebut this presumption and establish eligibility for a separate rate through evidence of the absence of both de jure and de facto government control. *Id.* If a respondent fails to do so, however, Commerce may rely upon the presumption of government control and apply the country-wide rate to that respondent. *Transcom*, 182 F.3d at 882.

Here, substantial evidence supports Commerce's determination that Dongtai Peak failed to demonstrate the absence of de facto and de jure government control, as required for separate-rate status, and therefore that the company is part of the China-wide entity. Contrary to Dongtai Peak's contention, the company's initial Section A response was insufficient to establish its separate rate eligibility. Without a timely-filed Supplemental Response, Commerce did not have information regarding Dongtai Peak's "shareholders, management, accounting practices, corporate structure, and affiliations," and information addressing whether "several organizations to which [Dongtai] Peak belonged were state-sponsored, controlled [Dongtai] Peak's business operations or coordinated [Dongtai] Peak's export activities." *Issues & Dec. Mem.* at 12. Furthermore, Dongtai Peak does not identify any evidence in its initial Section A response that demonstrates lack of government control. As the CIT properly found, while the initial Section A response provided "some evidence of its eligibility for a separate rate," it was

"insufficient to render Commerce's decision unsupported by substantial evidence." *Dongtai Peak*, 971 F. Supp. 2d at 1242.

As to Dongtai Peak's contention that there was no record evidence of government control, this argument ignores that under the law for non-market economy countries, all respondents are *presumed* to be subject to governmental control unless they meet the burden of proving otherwise. *See Sigma*, 117 F.3d at 1405. Further, while Appellant claims the Supplemental Questionnaire did not request any information that would have demonstrated Dongtai Peak's eligibility for a separate rate, the record shows the Supplemental Questionnaire contains a "Separate Rates" section requesting specific information regarding Dongtai Peak's shareholders, management, and affiliation with other entities within the Chinese honey industry, as well as information related to quantity and value, structure, sales process, accounting and financial practices, and merchandising. J.A. 158–77. Accordingly, this court agrees with the CIT that "[b]ecause [Dongtai] Peak failed to file either its [Supplemental Response] with this information or an extension request before the deadline, Commerce reasonably concluded that Peak failed to demonstrate the absence of government control." *Dongtai Peak*, 971 F. Supp. 2d at 1243.

V. Commerce's Application of AFA and Its Selection of an AFA Rate Were Supported by Substantial Evidence

Finally, Dongtai Peak argues Commerce's application of AFA was improper because Commerce had no basis to apply AFA aside from the late filing of the Supplemental Response. Appellant's Br. 32 ("[F]rom its observation that it rejected Appellant's submission as untimely, Commerce jumped to the conclusion that Appellant 'did not cooperate to the best of its ability.'" (citation omitted)). That is, to Appellant, "there is no meaningful evidence on the record

indicating that Appellant did not cooperate to the best of its ability." *Id.* at 33. At center, Dongtai Peak contends

> Commerce is throwing out the entire case record, terminating the entire review proceeding, and implementing maximum punitive and penalizing measures (via the application of full [AFA]) simply because Appellant was two days late requesting a deadline extension for a mere supplemental questionnaire dealing with a single section (section A)—a supplemental questionnaire that Appellant did ultimately complete and submit to the record. This is unfair and out of balance, in violation of fundamental fairness principles of antidumping law.

*Id.* at 27.

As to the AFA rate Commerce selected for the China-wide entity, as noted, Commerce used the calculated rate for Anhui Native from the 2006–2007 administrative review. Appellant argues, "[g]iven fluctuations in sales prices, production and transportation costs, [and] market conditions, . . . it was unreasonable for Commerce to rely upon such an old rate, and to assume, without the least investigation or corroboration, that such a rate was reliable, relevant, or at all accurate." *Id.* at 36. Dongtai Peak further contends the AFA rate is not based on its own sales and production data for the current period of review, therefore violating the requirement that Commerce calculate the most accurate dumping rates possible. *Id.*

During its periodic administrative reviews, Commerce requests information from respondents and if a respondent "significantly impedes a proceeding," Commerce is permitted to use "facts otherwise available" to determine an antidumping duty rate. 19 U.S.C. § 1677e(a)(2)(C). If Commerce further finds a respondent has "failed to cooperate by not acting to the best of its ability to comply with

a request for information," then it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" (i.e., it may apply AFA). *Id.* § 1677e(b). "[T]he statutory mandate that a respondent act to 'the best of its ability' requires the respondent to do the maximum it is able to do." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (citation omitted).

In selecting an AFA rate, Commerce may use information from the petition, investigation, prior administrative reviews, or "any other information placed on the record." 19 U.S.C. § 1677e(b); *see Gallant Ocean*, 602 F.3d at 1323 ("[I]n the case of uncooperative respondents," Commerce has discretion to "select from a list of secondary sources as a basis for its adverse inferences."); *F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000). However, when Commerce "relies on secondary information rather than on information obtained in the course of an investigation or review," it "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c). To corroborate secondary information, Commerce must find the information has "probative value," *KYD, Inc. v. United States*, 607 F.3d 760, 765 (Fed. Cir. 2010), by demonstrating the rate is both reliable and relevant, *Gallant Ocean*, 602 F.3d at 1323–24.

Here, in the Supplemental Questionnaire, Commerce warned that "failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, . . . which may include adverse inferences [(i.e., AFA)]." J.A. 159. Therefore, Commerce found Dongtai Peak was "fully aware of the established deadlines in this case, advised of the importance of meeting deadlines and the possible consequences should it not meet those deadlines." *Issues & Dec. Mem.* at 15. In contrast to Appellant's argument,

Commerce did not simply base its "failure to cooperate" conclusion on the untimely filings; rather, the record indicates Commerce considered the circumstances of Dongtai Peak's untimely submission and found the reasons provided (i.e., computer failure, communication problems, translation problems, overlapping deadlines, and a national holiday) did not prevent Dongtai Peak from timely filing an extension request. *Id.* at 15–16. Thus, based on the record, Commerce reasonably concluded Appellant "placed itself in a position in which it could not comply with the deadline." *Id.* at 16.

As this court has noted, "[c]ompliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth *its maximum effort* to provide Commerce with full and complete answers to all inquiries," and "[w]hile the standard does not require perfection and recognizes that mistakes sometimes occur, it *does not condone inattentiveness, carelessness,* or inadequate record keeping." *Nippon Steel*, 337 F.3d at 1382 (emphases added). Because Dongtai Peak was aware of the deadline and had the opportunity to file an extension request prior to its expiration, its failure to do so indicates an inattentiveness or carelessness with regard to its obligations. This warranted application of AFA.

As to the AFA rate selected by Commerce for the China-wide entity, Commerce properly corroborated the rate by demonstrating why it was reliable and relevant. Specifically, the selected rate was reliable because it was calculated using verified sales and cost data for Anhui Native from a prior administrative review, and therefore "reflect[ed] the commercial reality of another respondent in the same industry" as Dongtai Peak. *Issues & Dec. Mem.* at 18; *see Gallant Ocean*, 602 F.3d at 1324 (To be reliable, "Commerce must select secondary information that has some grounding in commercial reality."). Furthermore, this court has clarified that when Commerce chooses a calculated dumping margin from a prior seg-

ment of the proceeding as the AFA rate, that rate is reliable. *See KYD*, 607 F.3d at 766–77 (Commerce's selection of the highest prior margin as the AFA rate reflects "a common sense inference that the highest prior margin is the most probative evidence of *current* margins because, if it were not so, the [responding party] knowing of the rule, would have produced current information showing the margin to be less."). Commerce further determined the rate was relevant because it was applied to the China-wide entity in the sixth and seventh administrative reviews. *See Issues & Dec. Mem.* at 18–19.

In addition, Dongtai Peak has not identified any record evidence indicating this rate lacked probative value, including any evidence regarding fluctuations in sales prices, production and transportation costs, or market conditions. To the extent Appellant claims Commerce erred in choosing an AFA rate that was not based on Dongtai Peak's own sales and production data for the current period of review, this argument is meritless. Because Appellant was part of the China-wide entity, Commerce was not required to calculate a separate AFA rate for Dongtai Peak and it was unnecessary for Commerce to corroborate the AFA rate for the China-wide entity using Dongtai Peak's own data. Substantial evidence supports Commerce's use of AFA in this case and its selection of an AFA rate for the China-wide entity.

## CONCLUSION

For the foregoing reasons, the decision of the United States Court of International Trade is

## AFFIRMED